UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
COREY REDDICK,

        Petitioner,

        - against –

WILLIAM LEE,

        Respondent.
---------------------------------------------------------X

**REPORT AND RECOMMENDATION**
**19 CV 4959 (MKB)(LB)**

**BLOOM, United States Magistrate Judge:**

    Petitioner, Corey Reddick, files this *pro se* petition for a writ of habeas corpus ("the petition") pursuant to 28 U.S.C. § 2254 challenging a 2015 New York Supreme Court, Kings County, conviction of Assault in the Second Degree and Criminal Possession of a Weapon in the Second Degree. Pet., ECF No. 1.[1] The Honorable Margo K. Brodie referred this petition to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that the petition should be denied.

## BACKGROUND

    **I.**    **The Underlying Crimes**

    According to the evidence adduced at trial, on February 8, 2013, at approximately 12:20 a.m., petitioner and Jarelle Whitehead got into a physical fight at a store in the Bedford-Stuyvesant neighborhood of Brooklyn, New York. Trial Tr., ECF No. 5-7 at 269-71, 283-84. The fistfight continued outside the bodega and petitioner fell on the sidewalk, hitting his face. Trial Tr., ECF No. 5-7 at 271; ECF No. 5-8 at 24. After petitioner got back up on his feet, petitioner and

---

[1] For ease of reference, all citations are to the ECF pagination of the state court record and the parties' briefs.

1

Whitehead "gave each other a [fist] pound" or handshake; the fight was over; and they parted ways. Trial Tr., ECF No. 5-7 at 271-72, 285; ECF No. 5-8 at 24-25. Prior to the fight, Whitehead knew petitioner for a couple of years having seeing him in the neighborhood. Trial Tr., ECF No. 5-7 at 273, 302. Whitehead and petitioner reportedly did not have a close relationship but had no problems with each other before the day of the fight. Id. at 273, 302-03.

After the fight ended, Whitehead went to a friend's home nearby. Id. at 272. Approximately 20 minutes later, while at his friend's home, Whitehead heard gunshots. Id. Whitehead looked out the window, saw petitioner "by face," and watched petitioner run away. Id. at 272-73. Shortly after, Whitehead left his friend's home, walked to the home of another friend, and came upon petitioner a few streets away. Id. at 273-75. Petitioner and Whitehead acknowledged each other, and Whitehead noticed petitioner with his hand in his pocket with a bulge. Id. at 275. Petitioner walked behind Whitehead, fired a shot at Whitehead, and then ran away. Id. at 276. Whitehead attempted to run after petitioner but was unable to because his "leg went dead." Id. at 276-77. Whitehead limped over to a friend's home nearby, where his friend called emergency medical services, and Whitehead was taken to Kings County Hospital in an ambulance. Id. at 277-79; see also id. at 310.

While at the hospital on February 8, 2013, Whitehead was interviewed by Detective Michael Plunkett about the shooting. Trial Tr., ECF No. 5-7 at 174, 280-81. On February 24, 2013, Detective Plunkett again interviewed Whitehead, who identified petitioner by photograph as the person who shot him. Id. at 307-08, 229. On February 27, 2013, Plunkett arrested petitioner at his home and brought him to the precinct. Id. at 177-78. After Plunkett had given petitioner his Miranda warnings and had told petitioner he would be charged with attempted murder—but before mentioning the details of Whitehead's injuries—petitioner said to Plunkett that he would

be charged with assault instead of attempted murder because, "when you shoot somebody below the waist, it's only an assault." Id. at 180-86.

## II.     Petitioner's Trial

Petitioner was tried by jury in New York Supreme Court, Kings County, from February 25 to March 6, 2015, before the Honorable Michael A. Gary. Trial Tr., ECF No. 5-6 at 162; ECF No. 5-8 at 222.

Shortly before the trial commenced, on February 23, 2015, the District Attorney's office received a notarized letter, signed by Whitehead, recanting the identification of petitioner as the shooter. Trial Tr., ECF No. 5-6 at 1-3. After Whitehead refused to testify at trial, Judge Gary held a Sirois hearing.[2] Trial Tr., ECF No. 5-7 at 59, 63-65. Assistant District Attorney Fayola Williams and Whitehead testified that people in the neighborhood had repeatedly approached Whitehead, as well as his girlfriend and family, and warned them against Whitehead "snitching" on petitioner, saying, *inter alia*, "watch your back." Id. at 68-87, 98-115. Whitehead testified that he signed the recantation letter in order to avoid testifying against petitioner and spoke to petitioner's mother and sister about his decision to recant. Id. at 100-07. Throughout his testimony, Whitehead reiterated his fear for the safety of himself and his family if he testified against petitioner. See, e.g., id. at 100, 104, 108, 117. Whitehead also testified that seeing people from the neighborhood, including petitioner's mother, sister, and relatives, in the courtroom would "bother" him and "affect" him, including the truthfulness of his trial testimony. See id. at 119-20. However, Whitehead assured the Court that he would testify truthfully in front of petitioner. Id. at 120.

---

[2] See Cotto v. Herbert, 331 F.3d 217, 225–26 (2d Cir. 2003) (citations omitted) (explaining that a Sirois hearing is "a hearing held in New York criminal cases to determine whether the defendant has procured a witness's absence or unavailability through his own misconduct, and thereby forfeited any hearsay or Confrontation Clause objections to admitting the witness's out-of-court statements" and is analogous to Mastrangelo hearings in this Circuit).

3

Although the prosecution conceded that they had not met their burden under Sirois and therefore could not introduce Whitehead's previous grand jury testimony at trial, id. at 122-23, the prosecution requested that the courtroom be closed to the public during Whitehead's testimony at trial, id. at 123-24. Petitioner's counsel objected to the closure. Id. at 124-27. The trial court granted a limited closure after finding that the record was "replete with instances" of Whitehead being threatened about testifying against petitioner and that it was proven that petitioner's family and friends were "involved in attempting to prevent Mr. Whitehead from testifying." Id. at 128-130. The Court ruled that the courtroom would remain open to the general public but petitioner's family and other individuals connected to petitioner, as "determined on an ad hoc basis," would be excluded during Whitehead's testimony. Id. at 130.

At trial, the prosecution called multiple witnesses to the stand, including Detective Plunkett. The prosecution asked Plunkett about what he saw in video surveillance footage of the neighborhood on the night in question, and Plunkett identified petitioner as the person seen in the video of the streets near where Whitehead was shot. Id. at 193-94, 199, 203-04, 209-216. Defense counsel objected and the trial court provided limiting instructions, directing the jury to treat Plunkett's testimony as opinion testimony as opposed to the surveillance video, which was evidence. See id. at 193. The Court instructed the jury to make their own conclusions about what the video showed. Id. at 193-94 ("The witness is giving his opinion of what he says he sees in the exhibit, but that is not controlling on you. You are going to look at the exhibit now, you can look at it later when you retire to deliberate. You will decide what, if anything, the exhibit shows."); see also id. at 199, 204, 214. Defense counsel elicited on cross examination that Plunkett did not have any expertise in identification and further objected to the identification of petitioner as the

4

person in the video, but the trial court allowed Plunkett's identification on the record. Id. at 214-16; id. at 227; id. at 245-49 (denying motion for mistrial based on objection).

The prosecution called Whitehead to the stand on February 27, 2015, and the Court barred petitioner's relatives from entering the courtroom during Whitehead's testimony. See id. at 251-53. Whitehead identified petitioner as the person who shot him in the leg. Id. at 275-77. Defendant called three witnesses at trial: Marshall Riddick, petitioner's friend who was present when the fight broke out between petitioner and Whitehead at the store, as well as petitioner's sisters. Riddick and petitioner's sisters testified, *inter alia*, that Riddick brought petitioner home after the fight, and after Riddick left, petitioner stayed home talking to his girlfriend on the phone in his bedroom. Trial Tr., ECF No. 5-8 at 19-40, 41-63, 64-86, 92.

After three days of deliberations, the jury found petitioner guilty of Assault in the Second Degree and Criminal Possession of a Weapon in the Second Degree on March 6, 2015. Trial Tr., ECF No. 5-8 at 235; N.Y. Penal Law §§ 120.05(2), 265.03(1)(b). Petitioner was sentenced on April 20, 2015, to concurrent terms of twelve years of imprisonment and five years of post-release supervision for criminal possession a weapon and five years of imprisonment and three years of post-release supervision for the assault. Hr'g & Sentence Tr., ECF No. 5-1 at 38.

### III. Procedural History

Petitioner appealed his conviction to the New York Appellate Division, Second Department, and argued the same grounds on appeal as he raises here: i) petitioner was deprived of his Sixth Amendment right to a public trial when petitioner's family members were excluded from the courtroom during Whitehead's trial testimony; ii) the trial court erred by allowing Detective Plunkett to identify petitioner in surveillance footage and the error was not harmless; and iii) the imposition of a twelve-year prison sentence was excessive. See Def.-Appellant's Br.,

5

ECF No. 5-9 at 3. The Appellate Division, Second Department, affirmed the trial court's judgment on August 1, 2018, finding that: i) the trial court's limited closure, excluding petitioner's family from the courtroom during Whitehead's testimony, did not deprive petitioner of his right to a public trial; ii) while the trial court erred in allowing Detective Plunkett to testify as to his opinion that petitioner was the person seen in surveillance video, the error was harmless; and iii) petitioner's sentence was not excessive. People v. Reddick, 164 A.D.3d 526 (2d Dep't 2018). Petitioner moved *pro se* to reargue his appeal, but his application was denied by the Appellate Division on January 10, 2019. Notice Mot. Reargument, ECF No. 5-9 at 126-27; Decision & Order, ECF No. 5-9 at 154. Petitioner's request for leave to appeal to the New York Court of Appeals was denied on November 26, 2018. People v. Reddick, 32 N.Y.3d 1114 (2018).

### IV. Instant Petition

On August 27, 2019, petitioner timely filed the instant *pro se* petition, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pet., ECF No. 1. Petitioner challenges his conviction on the same grounds he presented on appeal. See Pet., ECF No. 1 at 2, 5-6, 8. Respondent opposed the petition, see generally Mem. Law Opp'n Pet., ECF No. 5 at 5-15 [hereinafter "Resp't Br."], and petitioner filed a reply, Reply Mem. Law, ECF No. 7 [hereinafter "Reply Br."].

## DISCUSSION

### I. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the AEDPA,

6

the reviewing court may only grant a habeas petition if petitioner's claim "was adjudicated on the merits in State court proceedings" and the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet' . . . and 'highly deferential standard[,]'" and review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted). Moreover, a state court's factual findings "shall be presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." Fernandez v. Capra, 916 F.3d 215, 221 n.1 (2d Cir. 2019) (citing § 2254(e)(1)) (internal quotation marks omitted).

A state court decision is "contrary to" clearly established Federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' the state court arrived at a result opposite to the one reached by the Supreme Court." Evans v. Fischer, 712 F.3d 125, 132 (2d Cir. 2013) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established Federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The Court cautions, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410 (emphasis in original); see also Grayton v. Ercole, 691 F.3d 165, 174 (2d Cir. 2012) ("[T]he writ may only issue where the state court's application of the law was not only wrong, but unreasonable."). A federal habeas court

7

may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011).

## II.     Petitioner's Claims

Petitioner raises three grounds for habeas review: 1) a violation of petitioner's right to a public trial, 2) a violation of petitioner's right to a fair trial, and 3) an excessive sentence claim. Pet., ECF No. 1 at 5-8.

### A.  Petitioner's Sixth Amendment Right to a Public Trial

Petitioner argues that his Sixth Amendment right to a public trial was violated when the state court barred petitioner's family and friends from the courtroom during Whitehead's testimony "without legal justification," as the evidence presented at the Sirois hearing did not support a courtroom closure. Pet., ECF No. 1 at 5; see generally Reply Br., ECF No. 7.

The Sixth Amendment to the United States Constitution guarantees the accused the right to a public trial; however, the right "is not absolute and 'may give way in certain cases to other rights or interests.'" Moss v. Colvin, 845 F.3d 516, 520 (2d Cir. 2017).  The Supreme Court in Waller established a four-prong test for whether a courtroom closure is permitted under the Sixth Amendment:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Waller v. Georgia, 467 U.S. 39, 48 (1984). See also Weaver v. Massachusetts, 137 S. Ct. 1899, 1909 (2017) (citing Presley v. Georgia, 558 U.S. 209 (2010)); Gibbons v. Savage, 555 F.3d 112, 116 (2d Cir. 2009) (explaining that a § 2254 petition may not be granted by a district court under a heightened standard for exclusion of a defendant's family members from the courtroom); Smillie

8

v. Greiner, 99 F. App'x 324, 326 (2d Cir. 2004) (summary order) (citing Yung v. Walker, 341 F.3d 104, 109-11 (2d Cir. 2003)) ("[The AEDPA] requires us to apply the 'more general teachings of Waller' even when reviewing the exclusion of family members."). [3]

Here, the trial court ruled that petitioner's family and other individuals "connected to" petitioner as determined by the Court on an *ad hoc* basis would be barred from entering the courtroom during Whitehead's trial testimony, but the courtroom would remain open to the general public during Whitehead's testimony. See Trial Tr. ECF No. 5-7 at 130. The ruling followed Whitehead's Sirois testimony that he felt scared when he went to meet petitioner's sister, id. at 111; he was afraid to testify truthfully because he feared for himself and his family, see id. at 108; and his fear might impact his testimony, id. at 117-18.[4] The Appellate Division concluded that "an overriding interest was sufficiently established through evidence, and reasonable inferences to be drawn therefrom, of the complainant's genuine fear of testifying in the presence of members of his community, including the defendant's family members." Reddick, 164 A.D.3d at 526 (citations omitted).

Petitioner argues that the exclusion of petitioner's family for the duration of Whitehead's testimony "failed to pass the Waller test," because Whitehead was not directly threatened by

---

[3] Petitioner acknowledges that Waller is the controlling test but argues that the "the proper standards to be applied to the particular facts in this case are in dispute[.]" Reply Br., ECF No. 7 at 1-2. However, the Appellate Division did apply the Waller standard on appeal, concluding that "*an overriding interest* was sufficiently established," Reddick, 164 A.D.3d at 526 (emphasis added), and did not apply the lower "substantial reason" standard advocated by respondent, see Resp't Br., ECF No. 5 at 6 (citing Woods v. Kuhlmann, 977 F.2d 74, 76-77 (2d Cir. 1992)).

[4] Whitehead also testified at the Sirois hearing that in January 2015, a person named Larry, also known as Low, told Whitehead that petitioner's mother and his sister wanted to speak with him, that Low later provided Whitehead with the recantation letter that Whitehead signed, and that Low was going to give the signed recantation to petitioner's mother. Trial Tr., ECF No. 5-7 at 99-103. Moreover, the prosecution noted on the record that a tape recording existed of a January 4, 2015, telephone call, that petitioner made from detention on Rikers Island, during which petitioner spoke to his mother and sister about getting to his mother "a poem" so that a person identified as Low "could take care of it . . ." Id. at 122. The actual recording of the January 4, 2015, phone call was later admitted into evidence during petitioner's sentencing hearing. See Hr'g & Sentence Tr., ECF No. 5-1 at 20-31.

petitioner's mother and sister; instead, Whitehead expressed fear based on threats received indirectly "from the streets." Reply Br., ECF No. 7 at 2-4. Petitioner further argues, *inter alia*, that the exclusion stemmed from the trial court's bias and reiterates arguments advanced by defense counsel at trial that Whitehead's fears about testifying resulted from a generalized apprehension about testifying or undue pressure by the prosecution—not from threats by petitioner's family or members of the community. See Reply Br., ECF No. 7; Trial Tr., ECF No. 5-7 at 64, 126-27. The Court has considered petitioner's arguments, but respondent's argument prevails.

The trial court met its obligation to consider alternatives to closure but concluded that a partial closure was necessary to protect the overriding interests advanced concerning Whitehead's safety and candid testimony. Defense counsel offered the alternative to "move [the] witness to a safety area," Trial Tr., ECF No. 5-7 at 127, but the prosecution underscored that Whitehead believed he was in danger and seeing "people in the community" and petitioner's family in the courtroom "would lead [Whitehead] to be in fear and . . . would affect how he testified," id. 128.[5] Whitehead's truthful testimony regarding the shooting was likely to be prejudiced given his statements that seeing petitioner's relatives and other people from his community in the courtroom would "bother" him and their presence would affect his trial testimony. See id. at 119-20. See also id. at 76-77 (statements made to A.D.A. Williams); id. at 128-29 (finding that Whitehead was "struggling" with his fear and his duty to testify truthfully). Indeed, the overriding interests advanced, see id. 128-30, were consistent with the policy concerns underlying the right to a public

---

[5] It is unclear how defense counsel's suggestion to move Whitehead to "a safety area" would have resolved the concern that Whitehead's testimony could be affected by seeing petitioner's family and friends in the courtroom. Cf. Moss v. Colvin, 845 F.3d 516, 523 (2d Cir. 2017) (upholding the denial of a habeas petition where there was "some ambiguity as to why the trial court did not implement defense counsel's proposed alternative to closure").

trial, see Waller, 467 U.S. at 46 (citations omitted) ("In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury."). Because the courtroom was not closed to the general public, as the prosecution had requested, and instead was closed only to petitioner's family, as well as community members on an *ad hoc* basis,[6] the closure was no broader than was necessary to protect the interest in Whitehead's safety and truthful testimony. Cf. Presley v. Georgia, 558 U.S. 209, 215 (2010) (finding error where the trial court failed to consider alternatives to closure and did not identify an overriding interest likely to be prejudiced).

Furthermore, the trial court expressly made specific findings in support of the closure ruling:

> I find that it has been proven to me beyond a reasonable doubt that Mr. Whitehead is an individual who is struggling of course with what he considers to be his obligation to testify truthfully and the fear that he so justly experiences now . . . the record is replete with instances where [Whitehead] has been subjected to threats if he testifies against the defendant. It is clear that Mr. Whitehead, at least, for good reason, believes that both the defendant's sister, mother, and friends, have all orchestrated a campaign to prevent him from testifying . . . in regards to the defendant's family and friends, it is absolutely proven to this Court by clear and convincing evidence that those individuals have been involved in attempting to prevent Mr. Whitehead from testifying.

Trial Tr., ECF No. 5-7 at 128-30. The Court underscored that Whitehead's fear was not merely a normal apprehension about testifying and being labeled a snitch. Trial Tr., ECF No. 5-7 at 129-30 ("I will take judicial notice of the fact that I could count on one hand the number of situations in over 30 years of being a judge where a witness has literally submitted his own recantation that he got notarized . . . That is an extremely unusual circumstance . . . The idea that Mr. Whitehead felt

---

[6] The Court explained that Whitehead could not describe specifically "who else was involved in terms of [] threats made against him[.]" Trial Tr., ECF No. 5-7 at 130.

11

that if he indeed provided such a recantation as it was explained to him, that would get him out of trouble, that would end the threats.").[7]

In light of the record herein, the state court's decision regarding the partial closure of the courtroom during Whitehead's testimony was not contrary to, or an unreasonable application of, clearly established Federal law. Cf. McGough v. Lee, No. 17 CV 847 (JKS), 2019 WL 2869438, at *3-5 (N.D.N.Y. July 3, 2019) (finding no Sixth Amendment public trial violation where the closure "was intended to protect the overriding interest of the witness' valid fear of harm").[8]

### B. Petitioner's Right to a Fair Trial

Petitioner argues that, by allowing Detective Plunkett to identify petitioner as the person in the surveillance video, the state court deprived petitioner of a fair trial since the improper identification related to "the heart of" his alibi defense. Pet., ECF No. 1 at 6. On appeal, petitioner's appellate counsel argued that Plunkett's identification of petitioner constituted an improper lay witness opinion, Def.-Appellant's Br., ECF No. 5-9 at 46-49, and that the trial court's erroneous admission of Plunkett's testimony deprived petitioner of his constitutional right to a fair trial, id. at 46 (citing U.S. Const. amends. V, XIV). Counsel underscored that the trial court's error was not harmless because evidence of petitioner's guilt was not otherwise overwhelming—as the

---

[7] See Presley, 558 U.S. at 215 (citations omitted) ("There are no doubt circumstances where a judge could conclude that threats of improper communications . . . or safety concerns are concrete enough to warrant closing . . . But in those cases, the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'"). See also Yung, 341 F.3d at 111 ("The fourth Waller prong turns, not on whether the court's factual findings are supported by sufficient evidence—the focus of § 2254(d)(2)—but on whether the presumptively correct findings are adequate to support the closure."). Cf. Jordan v. Lamanna, No. 18 Civ. 10868 (SLC), 2020 WL 5743519, at *13-16 (S.D.N.Y. Sept. 25, 2020) (concluding that the Waller test was not satisfied where the trial court ordered a complete closure without "making any findings as to the propriety of the closure").

[8] The Clerk of Court is directed to send petitioner the attached copies of all the unreported cases cited herein.

12

jury deliberated for three days and received an Allen charge.[9]  See id. at 50-53.  The Appellate Division concluded that the trial court indeed erred by permitting Plunkett to testify that petitioner was the person depicted in surveillance video, which was improper lay witness testimony under the circumstances of the case, but held that the error was harmless. Reddick, 164 A.D.3d at 526-27.  The Appellate Division concluded that evidence of petitioner's guilt was overwhelming even "without reference to the error," and, "particularly given the limiting instruction provided by the Supreme Court, there was no significant probability that the error might have contributed to the defendant's convictions." Id. at 527 (citation omitted).

Federal habeas review of a state court's evidentiary ruling is limited. See Perez v. Greiner, No. 01 Civ. 5522 (AKH), 2002 WL 31132872, at *5 (S.D.N.Y. Sept. 25, 2002) (citing Estelle v. McGuire, 502 U.S. 62, 67 (1991)) ("The Supreme Court has held that federal habeas courts will not review evidentiary rulings made by a state court unless a conviction resulting from those rulings violates the Constitution, laws, or treaties of the United States.").  Here, the Appellate Division found that the evidentiary ruling allowing Plunkett to provide his opinion that petitioner was the person depicted in the video was in fact erroneous, but that the error was harmless. Reddick, 164 A.D.3d at 526-27.  The question before this Court is whether the error in admitting Plunkett's testimony was a violation of federal law that entitles petitioner to habeas relief.  Liberally construed, the petition alleges that the erroneous admission of Plunkett's testimony deprived him of due process under the Fourteenth Amendment.

Although a harmlessness determination concerning evidence erroneously admitted in violation of state evidentiary law is a state law question not subject to federal habeas review under

---

[9] "[W]hen a trial court receives notice that the jury is deadlocked it may give a charge, commonly referred to as an 'Allen' charge, that urges the jurors to continue deliberations in order to reach a verdict." United States v. Vargas-Cordon, 733 F.3d 366, 377 (2d Cir. 2013) (citation omitted).

13

§ 2254, a district court may "review an error of state evidentiary law to assess whether the error deprived the petitioner of his due process right to a 'fundamentally fair trial.'" Freeman v. Kadien, 684 F.3d 30, 34–35 (2d Cir. 2012) (citations omitted) (affirming the denial of the petition where the harmlessness determination regarding an underlying error of state law "was itself a decision of state law that cannot form the basis for federal habeas relief"); see also Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) (citation omitted) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a *fundamentally fair* trial.'") (emphasis in original). To decide whether the erroneous admission of the evidence is "so extremely unfair that its admission violates fundamental conceptions of justice" and thus violates due process, the district court examines "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Borgella v. Bell, No. 18 CV 2026 (ARR), 2019 WL 2527293, at *6 (E.D.N.Y. June 19, 2019) (quoting Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) and Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)), appeal dismissed (Oct. 16, 2019).

Here, Detective Plunkett identified petitioner as the person appearing in videotape surveillance from the night in question taken in or around the scene of the crime. See Trial Tr., ECF No. 5-7 at 193-216. Appellate defense counsel argued that Plunkett's testimony identifying petitioner as the person in the surveillance video may have weighed heavily in the jury's determination of petitioner's guilt. See Def.-Appellant's Br., ECF No. 5-9 at 46-53.[10] However, Whitehead also identified petitioner as the person appearing in video surveillance footage. Trial

---

[10] Yet, during their extended deliberations, Trial Tr., ECF No. 5-8, 201-34, the jurors notably did not request Plunkett's testimony; rather, the jurors only asked for readbacks of Whitehead's testimony, id. at 203, 216, 231.

14

Tr., ECF No. 5-7 at 279, 301-02. Moreover, the trial court provided multiple limiting instructions to the jury, effectively directing the jurors to draw their own conclusions about what and who appears on the video based on their viewing of the evidence, as opposed to relying on Plunkett's "opinion testimony." Id. at 193-94, 199, 204, 214. In addition, the prosecution offered other, compelling evidence of petitioner's guilt that the jury apparently credited over defendant's alibi defense. Most importantly, Whitehead testified at trial and identified petitioner as the person who shot him. Id. at 275-76.[11]

In light of the record, the trial court's erroneous admission of Plunkett's testimony was not so material as to have deprived petitioner of his constitutional right to a fundamentally fair trial.[12] Accordingly, the state court's harmless error decision was not contrary to, or an unreasonable application of, clearly established Federal law.

### C. Petitioner's Sentence

Petitioner was sentenced to concurrent terms of twelve years' imprisonment and five years of post-release supervision for criminal possession a weapon and five years' imprisonment and

---

[11] Additional evidence of petitioner's guilt included petitioner stating, after being Mirandized and told he was facing an attempted murder charge, that, "when you shoot somebody below the waist, it's only an assault," without being given any information about Whitehead's injuries. See Trial Tr., ECF No. 5-7 at 184-86.

[12] The Brecht "substantial and injurious effect" harmless error standard on collateral review of state court convictions applies only to errors of federal law, not to errors of New York state law. Freeman, 684 F.3d at 34 (citing Brecht v. Abrahamson, 507 U.S. 619 (1993), Fry v. Pliler, 551 U.S. 112, 121-22 (2007), and Wood v. Ercole, 644 F.3d 83, 93-94 (2d Cir. 2011)). Even if petitioner had established an error of federal law, petitioner does not meet the Brecht standard for the same reasons that he does not establish a due process violation. See Brecht, 507 U.S. at 637 ("[G]ranting habeas relief merely because there is a reasonable possibility that trial error contributed to the verdict, is at odds with the historic meaning of habeas corpus . . . ") (internal citations and quotation marks omitted)); cf. Spencer v. Capra, 788 F. App'x 21, 24 (2d Cir. 2019) (summary order) (reversing the grant of the writ and concluding petitioner did not meet the Brecht standard where the prosecution's evidence was "weighty" even if the people's case suffered from some weaknesses).

three years of post-release supervision for the assault. Hr'g & Sentence Tr., ECF No. 5-1 at 38. Petitioner argues that his sentence of 12 years was excessive in light of the 15-year maximum sentence and his status as a first-time felon. Pet., ECF No. 1 at 8. On appeal, defense counsel argued that petitioner's sentence should be reduced to eight years in the interest of justice. See Def.-Appellant's Br., ECF No. 5-9 at 53-58 (noting, *inter alia*, petitioner's history of mental health issues, work in his community, family support, and lack of criminal record, and that he was a father of a young child).

An excessive sentence claim is not cognizable on federal habeas review where the length of a sentence is within the prescribed state law range. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); Cardova v. Lavalley, 123 F. Supp. 3d 387, 398 (E.D.N.Y. 2015) (citations omitted) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law.").

Here, petitioner's sentence falls within the range prescribed by state law. Therefore, petitioner's excessive sentence claim is not a cognizable ground for habeas relief.

## CONCLUSION

Accordingly, it is respectfully recommended that petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254 should be denied. As petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability should be issued. 28 U.S.C. § 2253; see Lozada v. United States, 107 F.3d 1011, 1017 (2d Cir. 1997), abrogated on other grounds by United States v. Perez, 129 F.3d 255, 259–60 (2d Cir. 1997) (discussing the standard for issuing a certificate for appealability). It is further recommended that for purposes of an appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a) that any

appeal from a judgment denying this petition would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962).

**FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Any request for an extension of time in which to file objections must be made within the fourteen-day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 174 (2d Cir. 2000); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

SO ORDERED.

                                                                                _____/S/_____
                                                                                LOIS BLOOM
                                                                                United States Magistrate Judge

Dated: November 4, 2020
       Brooklyn, New York